# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BLAST MOTION INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:17-cv-00733 |
| v. | ) |
| | ) |
| DIAMOND KINETICS, INC. ET AL, | ) |
| | ) |
| Defendants. | ) |

## OPINION

**Mark R. Hornak, United States District Judge**

Blast Motion Inc. ("Blast Motion") alleges that Diamond Kinetics, Inc. ("Diamond Kinetics") infringes five of Blast Motion's patents generally related to motion capture technology for sporting equipment. All of the asserted patents are in the same patent family. The parties currently dispute one term that appears in each independent claim of U.S. Patent No. 9,039,527 (the "'527 Patent"): "broadcasting." Both parties have submitted proposed constructions for the term and the matter has been fully briefed. (ECF Nos. 55-1, 62, 63, 65). The Court heard argument on the parties' positions on September 26, 2018.[1] The matter is now ripe for disposition.

## I. BACKGROUND

Blast Motion produces a wireless motion sensor—the "Blast Sensor"—that can be attached to a person or piece of sporting equipment, such as a baseball bat or golf club. Using a number of integrated sensors, the Blast Sensor generates raw data corresponding to the sensor's position, velocity, acceleration, angular velocity, and angular acceleration. These data may then be sent to other devices for processing and conversion of the data into more usable forms. These data can

---

[1] Which in the Court's estimation was very well-presented by all counsel.

also be sent to other devices for viewing metrics and recorded videos. Blast Motion has also developed mobile applications and software for use with the Blast Sensor.

The accused device produced by Diamond Kinetics is also a wireless motion capture device and accompanying mobile application. Diamond Kinetics' device is designed to be used with a baseball bat and has similar features and functionality as the Blast Sensor. The present dispute concerns, among other things, how augmented data is sent from the accused product to other display devices.

The '527 Patent is entitled "Broadcasting Method for Broadcasting Images with Augmented Motion Data" and issued on May 26, 2015. Blast Motion is the applicant and assignee of record of the patent. The '527 Patent discloses a method for "broadcasting images with augmented motion data, which may utilize a system having at least one camera, a computer and a wireless communication interface." U.S. Patent No. 9,039,527 abstract (filed Sept. 8, 2014). The disputed term—"broadcasting"—appears in every independent claim of the '527 Patent. *Id.* at 42:55–43:41, 45:27–46:25, 46:58–47:52. The '527 Patent and the presently disputed term were previously construed in *Blast Motion, Inc. v. Zepp Labs, Inc.*, No. 3:15-cv-00700, 2017 WL 476428 (S.D. Cal. Feb. 6, 2017) (Sammartino, J.).

## II. LEGAL STANDARD

### a. Claim Construction

Claim construction is a matter of law that is to be exclusively determined by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). Claim construction must begin with an analysis of the claims themselves. *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 365 F.3d 1299, 1303 (Fed. Cir. 2004). The words of a claim "are generally given their ordinary and customary meaning" which is "the meaning that the term would have to a person of ordinary skill

in the art in question at the time of invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (*en banc*). But claim terms "must be construed in light of the specification and prosecution history, and cannot be considered in isolation." *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1308–09 (Fed. Cir. 2014) (citing *Phillips*, 415 F.3d at 1313). That is, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. At times, the ordinary meaning of the claim terms is so apparent that detailed construction and analysis is unnecessary. *Id.* at 1314. But, more often, this meaning is "not immediately apparent" and thus courts "look[] to the sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

"The specification is the single best guide to the meaning of a disputed claim term and is, thus, the primary basis for construing the claims." *Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Phillips*, 415 F.3d at 1315) (internal quotation marks omitted). But, limitations from the specification are generally not to be read into the claims. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001); *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 836 (Fed. Cir. 1991) ("[W]here a specification does not *require* a limitation, that limitation should not be read from the specification into the claims.") (emphasis in original).

Finally, courts may consider extrinsic evidence, such as expert testimony, dictionaries, and treatises, but "such evidence is generally of less significance than the intrinsic record." *VirnetX,*

*Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1316 (Fed. Cir. 2014) (citing *Phillips*, 415 F.3d at 1317). Further, this extrinsic evidence cannot be "used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324.

### b. **Effect of Prior Decision**

The precise term at issue here, in the same patent, was previously construed by another district court in *Zepp*. Diamond Kinetics correctly points out (and Blast Motion does not dispute) that the Southern District of California's conclusions are not binding on this Court because of obligatory preclusive or estoppel effects. (Diamond Kinetics' Opening Claim Construction Br. ("DK Br.") at 4, ECF No. 63). The Federal Circuit applies the law of the regional circuit in determining whether collateral estoppel applies to another district court's claim construction. *See RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1261 (Fed. Cir. 2003). Under Third Circuit law, in order for collateral estoppel to apply, a party must demonstrate that "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (internal quotations omitted). The parties in the *Zepp* matter reached a settlement prior to the disposition of pending Motions for Summary Judgment,[2] so the *Zepp* court's claim constructions could not have been "essential to the prior judgment." And, Diamond Kinetics was not a party in the prior action nor is there any indication that its interests were represented by the defendant in the *Zepp* matter. For at least these reasons, the Court likewise

---

[2] *See* Notice of Settlement, *Blast Motion, Inc. v. Zepp Labs, Inc.*, No. 3:15-cv-00700 (S.D. Cal. Dec. 17, 2017), ECF No. 186. The case was dismissed with prejudice on January 3, 2018. Order, *Blast Motion, Inc. v. Zepp Labs, Inc.*, No. 3:15-cv-00700 (S.D. Cal. Jan. 3, 2018), ECF No. 190.

concludes that the *Zepp* court's construction of the term "broadcasting" is not binding or otherwise preclusive.

Both parties also recognize that the *Zepp* decision construing "broadcasting" in the '527 Patent may be treated as, at minimum, persuasive authority. (DK Br. at 5 n.3). The Court agrees. Though the Court will, of course, undertake an independent analysis of the disputed claim term here, it will treat the *Zepp* decision "as persuasive authority and provide [it] the deference provided any legal holding by a respected colleague." *CoStar Realty Info., Inc. v. CIVIX-DDI, LLC*, No. 12 C 4968, 2013 U.S. Dist. LEXIS 135448, at *24 (N.D. Ill. Sept. 23, 2013). The Court is also mindful of the "importance of uniformity in the treatment of a given patent" and the public notice function served by uniform interpretation of patent claim terms. *See Markman*, 517 U.S. at 390 (noting "the importance of uniformity" as an additional justification for allocating claim construction to courts rather than juries).

### III. DISCUSSION

| **Blast Motion's Proposed Construction** | **Diamond Kinetics' Proposed Construction** |
| --- | --- |
| transmitting information capable of being received by multiple display devices | transmitting information simultaneously to multiple display devices |

Blast Motion's proposed construction is identical to Judge Sammartino's construction in *Zepp*. 2017 WL 476428 at *12. Blast Motion argues that this construction is supported by the claim language and intrinsic evidence, and thus should be adopted by this Court. More particularly, Blast Motion argues that the claim language of the independent claims is sufficiently clear to inform a skilled artisan of the meaning of "broadcast." (Blast Motion's Opening Claim Construction Br. ("Blast Br.") at 7, ECF No. 62). Blast Motion also asserts that the *Zepp* court heard and rejected similar arguments related to Diamond Kinetics' proposed removal of the "capable of" language

- 5 -

and addition of the "simultaneously" limitation. (*Id.* at 8). Finally, Blast Motion argues that Diamond Kinetics' proposed addition of "simultaneously" in the claim construction is unsupported by the specification of the '527 Patent. (*Id.* at 8–9).

Diamond Kinetics contends that the *Zepp* court did not consider arguments related to the inclusion of the term "simultaneously" in the construction of "broadcasting," and thus the Court should discount the persuasiveness of *Zepp*'s reasoning. (DK Br. at 4–5). Diamond Kinetics further asserts that Blast Motion's proposed construction is, in fact, broader and contrary to the construction in *Zepp* because it would cover "a series of transmissions to respective single display devices" or "a single transmission to a single network that is in communication with a multiple [sic] of display devices." (*Id.* at 5–6).[3] Diamond Kinetics also takes a different view of the intrinsic evidence. According to Diamond Kinetics, because "broadcast" appears throughout the specification with no explicit definition, "broadcast" must be construed according to "its ordinary and customary meaning as understood by one skilled in the art." (*Id.* at 6–7). In Diamond Kinetics' view, Blast Motion's construction is contrary to this understanding because it equates "broadcasting" with "transmitting" and improperly includes "indirect" broadcasting methods. (*Id.* at 6–8). In support of this argument, Diamond Kinetics cites the claim language and disclosed embodiments in the '527 Patent and other patents that were incorporated by reference that purportedly disclose embodiments that do not teach indirect broadcasting methods. (*Id.* at 7–8). Diamond Kinetics also cites a number of dictionary definitions and constructions of "broadcasting" from other courts construing unrelated patents to argue that a person skilled in the

---

[3] The Court disagrees with this assertion. After all, Blast is proposing the exact same construction that the *Zepp* court adopted.

- 6 -

art would understand "broadcasting" to require simultaneous transmission of information. (*Id.* at 13–14).

### a. "Capable of" limitation

Blast Motion proposes a construction wherein the transmitted information is "*capable of being received by multiple display devices.*" (Blast Br. at 6) (emphasis added). Diamond Kinetics' proposal does not have this language. (DK Br. at 1). The Court agrees with Blast Motion in that inclusion of the "capable of" term clarifies that the information may be transmitted to, but not received by, the display devices. Diamond Kinetics' proposal—without this language—could be read as suggesting that the information must actually be received by multiple display devices in order to be "broadcast," even when there are no available display devices that could then receive the information. The plain language of the claims is not so limiting. Rather, the method claimed is completed when the information is "broadcast[]" and not when the information is actually received or displayed by the display devices. *See* '527 Patent at 42:55–43:41. The specification supports this construction. For example, in the detailed descriptions of certain embodiments of the broadcasting method, the specification lists only equipment for collecting, generating, analyzing, and sending the data, but not equipment that receives and displays the augmented data. *See, e.g.*, *id.* at 20:39–47, 21:66–22:14. These embodiments, and others, describe "broadcast" as the act of sending, and not receiving, the information. There is no basis in the specification to limit the term based on an actual receipt of the data, nor has Diamond Kinetics identified one. The inclusion of "capable of" clarifies that information that is sent but not received is nonetheless "broadcast" so long as a multiplicity of display devices could receive the information.

### b. "Simultaneously" limitation

The crux of the parties' dispute is Diamond Kinetics' proposed addition of the "simultaneously" limitation. Both parties conceded at oral argument that direct simultaneous transmissions of information to a multiplicity of display devices are within the scope of the '527 Patent's claims. In Diamond Kinetics' view, the '527 Patent covers *only* such transmissions. Blast Motion argues that no such limitation is justified based on the plain language of the claims and the specification. (Hearing Tr. at 88:8–89:19, ECF No. 93).

#### i. "Broadcasting" will be construed as having its plain meaning in the context of the '527 Patent.

The Court begins its analysis with the claims themselves. *Scanner Techs.*, 365 F.3d at 1303. "Broadcasting" appears in each independent claim of the '527 Patent, and all of these claims are method claims. As such, these claims are "interpreted to cover any process that performs the method steps." *Schumer v. Lab. Comp. Sys., Inc.*, 308 F.3d 1304, 1312 (Fed. Cir. 2002) (internal quotations omitted). The plain language of the claims does not support Diamond Kinetics' proposed construction. There is no temporal or sequential limitation in the claims, let alone a limitation that data must be transmitted "simultaneously" in order to be a "broadcast." The claim identifies what is being broadcast ("said at least one avatar or said one or more images or both") and its intended destination ("a multiplicity of display devices"). Nothing in the claim language suggests that the type of display device is restricted, nor that the broadcast must or could not reach more than one type of display device via a particular broadcast.

The Court also notes that the specification of the '527 Patent does not support a departure from the plain meaning of the term. "[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal." *GE Lighting*, 750 F.3d at 1309 (citing *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed.

Cir. 2012)). For a patentee to act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to define the term." *Thorner*, 669 F.3d at 1365. For disavowal to apply, the specification must "make[] clear that the invention does not include a particular feature." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). "Broadcast" is used throughout the specification of the '527 Patent, but the term is not explicitly defined at any point. Lexicography principles thus do not apply. Likewise, the specification does not explicitly state that a "broadcast" dataset must be transmitted "simultaneously" so as to disavow non-simultaneous transmissions. Therefore, the dispositive issue for the Court to decide is what an ordinarily skilled artisan would understand the plain meaning of "broadcasting" to mean in the context of the '527 Patent. *Phillips*, 415 F.3d at 1313.

### ii. "Broadcasting" includes transmitting data to display devices "indirectly."

An important initial determination is whether "indirect" transmissions of data—such as, for example, sending a transmission of data to a network that may then further disseminate the data—are included in the scope of the term "broadcasting." Diamond Kinetics contends they are not. (DK Br. at 6). And, Blast Motion conceded at oral argument that information that is capable of being received by multiple display devices, and that is directly sent to those devices, must necessarily be sent to those display devices "simultaneously." (Hearing Tr. at 78:24–79:5). But, in Blast Motion's view, if data is first sent to some intermediate destination, such as a network, it could then be later transmitted to different types of devices at different times and the initial transmission would still be a "broadcast." (Blast Br. at 7).

In support of its contention, Diamond Kinetics argues that Figure 1 and Figure 1E of the '527 Patent disclose purportedly limiting embodiments that do not include a "network" within the

broadcasting method. (DK Br. at 7). Diamond Kinetics also argues that the *Zepp* court held that an indirect transmission "through a network of multiple receivers" was not within the construction of "broadcasting."

The Court does not agree that "broadcast" is limited so as to not include indirect broadcasting techniques. First, the claims of the '527 Patent claim the broadcasting *method* and do not require a particular structure or apparatus to perform the method. *See Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 922 (Fed. Cir. 1984). That is, so long as the augmented data is "broadcast" in the manner claimed, it is not important what particular equipment, structure, or apparatus accomplishes that task. Further, the claimed method is open-ended because the claims use the term "comprising." *See, e.g.*, *Smith & Nephew, Inc. v. Ethicon, Inc.*, 276 F.3d 1304, 1311 (Fed. Cir. 2001). Thus, the claim language itself is not limited to only the enumerated and claimed steps. Additional steps or the use of additional equipment that would accomplish "indirect" broadcasts are permissible so long as the claimed steps are performed.

Second, Diamond Kinetics misinterprets the specification. Even if one of the embodiments or examples identified by Diamond Kinetics does not include a network as part of the broadcasting system, this is insufficient intrinsic evidence to limit "broadcast" in the claims to exclude indirect transmissions. *See, e.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010) ("Generally, a claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a clear intention to limit the claim's scope with words or expressions of manifest exclusion or restriction.") (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted). No such "clear intention" appears in the '527 Patent specification. *Contra, e.g.*, '527 Patent at 18:24–20:40 (describing various

examples of non-limiting embodiments, including the embodiment depicted in Figure 1, and optional equipment and features they may have).

On that point, the Court also disagrees with Diamond Kinetics' characterization of the embodiment disclosed in Figure 1E. The detailed description of Figure 1E discloses that transmission of augmented data from the computer depicted in Figure 1E to the Internet is a method of broadcasting the augmented data.

> "The points that are connected may be further modified on computer 140 and the drawing may thus be completed and **broadcast out to the Internet** and over the television broadcast equipment for example."

'527 Patent at 24:49–53 (emphasis added). Even if other examples of broadcasting methods disclosed in the description of Figure 1E do not utilize the Internet or network, *see, e.g.*, *id.* at 24:7–14, there is nothing in those descriptions that demands, or even suggests, that a transmission of data to the Internet or network would not *also* be a broadcast of the data.[4] Other descriptions of Figure 1E confirm that the broadcasting method can be performed in a number of ways, individually or in combination. *See, e.g.*, *id.* at 22:9–14 ("The data flow in this example is ... out to the Internet for viewing on any type of computer 105 **and/or** out to the TV broadcast equipment 141 for over the air, satellite or other television broadcast mechanism.") (emphasis added).

Aside from these embodiments, Diamond Kinetics has not provided, and the Court does not believe there is any, intrinsic evidence that would support limiting "broadcasting" to direct transmissions to display devices. Indeed, the rest of the '527 Patent specification supports and enables the "indirect" broadcasting of data, and teaches that such transmissions to the Internet or

---

[4] The Court does not discern a meaningful difference between "network" and "Internet" for the purposes of determining whether the data can be broadcast indirectly. The Internet, after all, is itself a computer network. Merriam-Webster, https://www.merriam-webster.com/dictionary/Internet (last visited Oct. 22, 2018) (defining "Internet" as "an electronic communications network that connects computer networks and organizational computer facilities around the world").

network are, themselves, "broadcasts." *See* '527 Patent at 4:48–50 ("One or more embodiments may also **broadcast** the images to a multiplicity of display devices, and/or **to the Internet**.") (emphasis added); *Id.* at 21:59–65. And if augmented data is "broadcast" to the Internet it must, necessarily, be an "indirect" broadcast because the Internet is nothing more than a large computer network. That is, the Internet itself is not capable of displaying the augmented data, so for it to be received and displayed by a multiplicity of display the devices, the data must be further disseminated after it is transmitted to the Internet or otherwise accessed by the display devices after data transmission to the Internet. The '527 Patent contemplates several applications where this would occur. *See, e.g.*, '527 Patent at 11:35–40 (disclosing that "data uploaded to the Internet" can be "viewed" by "any computer that may obtain access to the data"); 22:9–14 (describing data flow in Figure 1E as "out to the Internet for viewing on any type of computer"); 22:22–44 (describing an application whereby an avatar may be displayed on a virtual reality device from an "Internet broadcast"). These examples counsel in favor of a construction of "broadcast" that allows for indirect broadcasts. *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment . . . "is rarely, if ever, correct."") (quoting *Vitronics*, 90 F.3d at 1583).

Diamond Kinetics also mischaracterizes the *Zepp* court's reasoning. The *Zepp* court did not hold that transmission of data "through a network of multiple receivers" was outside of the scope of "broadcasting." Rather, as the *Zepp* court explained, importing that limitation would be "unsupported" because "the patent explains that a broadcast *can* be sent directly to a device and thus *does not require* the broadcast to first go through a network of multiple receivers." *Zepp*, 2017 WL 476428 at *12 (emphasis added). In other words, the *Zepp* court only concluded that "broadcast" was not *limited to* indirect transmissions of data and that direct transmissions *were*

- 12 -

within the scope. In this way, the *Zepp* order's reasoning actually supports a broader construction of "broadcasting," and does not support limiting broadcasting based on whether the information is directly or indirectly transmitted.

### iii. Construing "broadcasting" to require that data must be transmitted "simultaneously to multiple display devices" would introduce an unjustified limitation.

Having concluded that "broadcasting" encompasses "indirect" broadcasts, the Court concludes that importing a limitation that the data must be transmitted "simultaneously to multiple display devices" would be unjustified. Neither the claim language of the '527 Patent, nor its specification, would support such a limitation. The specification discloses that the augmented data can be broadcast to "any . . . element capable of receiving such information."'527 Patent at 4:25–31. This includes "networks," *see id.*, and, as discussed above, the Internet. And, while a single transmission of data that is "capable of being received" by a multiplicity of display devices must necessarily be sent simultaneously vis-à-vis those particular display devices, neither the claims nor the specification dictate that a broadcast must only be sent to one group of display devices, or that all display devices that are to receive a dataset must be sent the dataset at the same time. That is, a dataset could be sent to the Internet or other network in one transmission which is then retransmitted to, for example, a group of cell phones. Sometime later, the network could then retransmit that same dataset to a group of computers, or televisions, or any other group of devices capable of receiving the information. Or, the Internet could remotely store the broadcast data and display devices could then access the data at a later time. In any case, once the dataset is sent to the network/Internet, the broadcast, as used in the '527 Patent, is complete. *See id.* at 21:36–40 (describing a "broadcast to . . . networks"); *see also id.* at 21:59–65 ("One or more embodiments may also broadcast the images . . . to the Internet."). There is no support in the claims or

specification to limit the scope of "broadcast" such that later possible downstream retransmission of a dataset (or lack thereof) would affect whether the initial transmission of the data was or was not a broadcast.

At oral argument, the parties disputed whether transmissions of data to distinct classes of display devices would be (or must be) considered separate broadcasts. (Hearing Tr. at 81:7–82:11). In Blast Motion's view, the answer is no. That is, a "broadcast" is characterized by the content of the transmission such that a dissemination of a unique dataset to one group of display devices (*e.g.*, televisions), followed by a later dissemination of the same dataset to a second group of display devices (*e.g.*, mobile devices), would constitute a single broadcast. Diamond Kinetics characterized a broadcast in terms of the actual transmission that is sent. So, in the same example, Diamond Kinetics would argue that the individual transmissions to the televisions and the mobile devices would be separate broadcasts.

The Court notes that while Diamond Kinetics' argument has a certain logical appeal, nonetheless, importing a limitation that would require a "simultaneous" transmission to multiple display devices would be over-inclusive. Most notably, this would not encompass broadcasts of the information to the Internet, which, as discussed, is plainly contemplated by the '527 Patent specification. *E.g.*, '527 Patent at 4:48–50. The specification does not, however, place a temporal limit on when the downstream display devices receive or access the information that is broadcast to the Internet. In other words, information that can be received by multiple display devices can be "broadcast" as envisioned by the '527 Patent but not received, accessed, or viewed by multiple display devices until some later time. An additional problem with Diamond Kinetics' proposed construction is that the information must be transmitted "simultaneously *to multiple display devices.*" Claim 7 of the '527 Patent, which depends on Claim 1, claims the additional step of

"broadcasting said one or more images to the Internet." *Id.* at 44:31–36. "It is well-established . . . that claim terms are to be construed consistently throughout a patent," *Phil-Insul Corp. v. Airlite Plastics Corp.*, 854 F.3d 1344, 1359 (Fed. Cir. 2017), and "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Research Plastics, Inc. v. Fed. Packaging Corp.*, 421 F.3d 1290, 1295 (Fed. Cir. 2005). The Internet is a computer network, not a display device. Diamond Kinetics' proposed construction would thus make no sense as the term is used in Claim 7. A person of ordinary skill in the art would not understand "broadcasting," in the context of the '527 Patent, to require a "simultaneous[]" transmission of information to "multiple display devices" if one of the claimed steps describes "broadcasting" information to something (the Internet) that is not a display device.

Diamond Kinetics also argues that the "simultaneously" limitation is needed or else "broadcasting" will essentially be equated to "transmitting." (DK Br. at 8). The Court does not agree. The transmitted information must still be "capable of being received by multiple display devices." Not all "transmissions" of data would meet this limitation. A targeted transmission of data to a single display device that was incapable of being received by any other display device would be a "transmission," but would not be a "broadcast."

### iv. Diamond Kinetics' extrinsic evidence does not persuasively support its proposed construction.

Diamond Kinetics also cites a number of other decisions from other courts that construed "broadcasting." The Court is not persuaded by these cases, as they concern different technology and different patents. For instance, in *Music Choice v. Stingray Digital Group, Inc.*, the court explained that "broadcast" was being construed only in the context of the patents in suit, which related to video-on-demand technology. No. 16-cv-586, 2017 WL 2896025, at *16 (E.D. Tex. July 6, 2017). Notably, the *Music Choice* court also observed that "broadcast" has "multiple plain and

ordinary meanings," underscoring the point that technological context is important. *Id. Baseball Quick, LLC v. MLB Advanced Media L.P.* involved a similar technological context. No. 11-cv-1735, 2014 WL 3728623 (S.D.N.Y. July 25, 2014). There, the term "broadcasting" appeared in a method claim "for providing a subscription" of an edited recording wherein one of the steps involved "broadcasting." *Id.* at *16. Here, the claims of the '527 Patent are themselves drawn to a "broadcasting" method. Diamond Kinetics asks the Court to discount the persuasiveness of the *Zepp* decision, which construed the exact same term in the exact same patent, yet favorably cites the reasoning of other courts that construed different patents in different technological fields. The Court does not believe that it is appropriate to do so, and the former will be afforded more weight.

Two of the cases cited by Diamond Kinetics are in the Court's judgment actually detrimental to their position. In *Discovery Patent Holdings, LLC v. Amazon.com, Inc.*, the court specifically declined to introduce the word "simultaneously" in its construction of "broadcast" because it would be an unsupported additional limitation. 769 F. Supp. 2d 662, 671 (D. Del. 2011).[5] And, in *TV/Com International, Inc. v. Mediaone of Greater Florida, Inc.*, the claims at issue included the word "simultaneous" in relation to "broadcasting," which supported the court's construction. No. 3:00-cv-1045-J-21HTS, 2001 WL 36169709, at *16 (M.D. Fla. Aug. 3, 2001). As explained, the claim language in the '527 Patent supports no such limitation.

Though not a dispositive consideration, the Court also finds the Southern District of California's reasoning on this construction to be sound. Further, the Court disagrees with Diamond Kinetics' assertion that the *Zepp* court did not consider whether a "broadcast" encompassed simultaneous transmissions. In summarizing the defendant's argument, Judge Sammartino noted that the defendant's proposed construction "requir[es] simultaneous transmission to multiple

---

[5] Moreover, the *Zepp* court cited this case favorably in its analysis. 2017 WL 476428 at *11 n.8.

receivers." *Zepp*, 2017 WL 476428 at *11. It appears to the Court that such a limitation was raised in that proceeding and implicitly rejected when the *Zepp* court adopted a construction of "broadcasting" without the "simultaneous" limitation. *See id.*

Finally, Diamond Kinetics offers several dictionary definitions in support of its construction. To the extent that these general purpose dictionary definitions are relevant, *see Phillips*, 415 F.3d at 1317, none of the provided definitions state, or suggest, that a broadcast must be transmitted simultaneously.

## IV. CONCLUSION

For the foregoing reasons, the Court construes the term "broadcasting" in U.S. Patent No. 9,039,527 as "transmitting information capable of being received by multiple display devices."

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated: October 24, 2018

cc: All Counsel of Record